In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1817

NATIONAL FOUNDATION FOR SPECIAL NEEDS INTEGRITY, INC.,

*Plaintiff-Appellee,*

*v.*

DEVON REESE, as Personal Representative for the
Estate of Theresa A. Givens,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15-cv-00545 — **Tanya Walton Pratt**, *Judge.*

ARGUED SEPTEMBER 27, 2017 — DECIDED FEBRUARY 7, 2018

Before RIPPLE, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* In this case, we apply Indiana law to a trust agreement to determine who receives the remainder funds upon the beneficiary's death. Plaintiff National Foundation for Special Needs Integrity signed an agreement with Theresa Givens establishing a trust that the Foundation was to manage for her benefit while she lived. In the agreement, Givens named herself as the only contingent remainder

beneficiary. Givens died just a month after funding the trust, leaving more than $234,000 in the trust.

By naming herself, Givens failed to specify a surviving remainder beneficiary. The Foundation claims that the agreement entitles it as trustee to retain any remaining trust assets in this situation. Givens's son, defendant Devon Reese, is the representative of her estate. The Estate argues that it is entitled to the money for the benefit of Givens's children. The Estate argues that the agreement is ambiguous and should be construed against the Foundation, and in the alternative that the court should use its equitable power to reform, rescind, or order deviation from the agreement's terms.

The district court rejected the Estate's arguments, finding that the trust agreement is unambiguous and that the Estate's evidence does not warrant any equitable remedy. The court also found that the equitable defense of laches would bar the Estate's equitable theories. We reverse. We find that the trust agreement is ambiguous on the key question. Beyond the document, the overwhelming weight of evidence shows that Givens intended that any remaining assets pass to her children as the beneficiaries of her Estate rather than to the Foundation. We therefore remand and direct entry of judgment for the Estate, without reaching the equitable theories or the laches defense. On remand the district court will need to award damages and prejudgment interest in favor of the Estate.

I.  *Factual and Procedural Background*

   A.  *Theresa Givens and Her Assets*

Theresa Givens was a Missouri resident and was sick for many years before she died in November 2011. She suffered from renal failure, was on dialysis for about ten years, and

had experienced multiple strokes. In 2009, she suffered an additional injury from gadolinium dye, a substance used in MRIs. She then joined a class action related to the dye, with the Missouri law firm Brown & Crouppen as her counsel. When that suit settled in 2011, Givens received about $255,000 in net settlement proceeds.

B.  *The National Foundation for Special Needs Integrity*

The National Foundation for Special Needs Integrity is an Indiana not-for-profit corporation that is a trustee for a pooled special needs trust. A special needs trust is a type of trust that allows individuals with disabilities to avoid losing eligibility for Medicaid, which is means-tested. See 42 U.S.C. § 1396p(d)(4)(C). The Foundation acts as trustee for many qualifying individuals across the country. Under federal law, the Foundation must pool all beneficiaries' assets for purposes of custody, management, and investment. 42 U.S.C. § 1396p(d)(4)(C)(ii). The Foundation must also maintain a separate sub-account for each beneficiary. *Id.*

The key feature of the special needs trust is that, under federal law, trust assets do not count against the beneficiaries' eligibility for Medicaid during their lifetimes. Compare 42 U.S.C. § 1396p(d)(3) (counting assets in certain trusts as income and assets of individuals seeking Medicaid), with § 1396p(d)(4)(C) (exempting special needs trusts from this accounting). But upon a beneficiary's death, the trustee must reimburse the state for any medical assistance the state provided. § 1396p(d)(4)(C)(iv). The trust agreement can direct who should receive any assets that might remain after reimbursement.

C. *The Trust Agreement*

On the advice of her lawyers, and to maintain her eligibility for Medicaid, Givens agreed to contribute the settlement proceeds to a special needs trust. She signed an agreement with the plaintiff Foundation in August 2011. The agreement identified the Foundation as the trustee and Givens as the beneficiary during her lifetime. Givens funded the trust in October 2011 but died a month later. In this rather unusual case, Givens did not owe her state of residence any reimbursement upon her death, leaving about $234,000 available to someone. This dispute is about what happens to these remaining funds that the government does not claim.

Section IV of the agreement is titled "Distributions upon the Death of a Beneficiary" and states, as relevant here:

> *Except in the event* that this Article Fourteen may be in the future amended to effectuate the letter, spirit, and purpose of 42 U.S.C. § 1396p(d)(4)(C)(iv), *The National Foundation for Special Needs Integrity, Inc. shall not retain any portion of the Beneficiary's trust Sub-Account upon his or her death*. Rather, all such amounts shall be reimbursed to the state of Missouri, by and through the Missouri Department of Health and Family Services, up to the full amount that it has expended on the Beneficiary, both before and after the creation of this trust.

(Emphasis added.) Later in the same section, the Agreement states: "If no secondary Contingent/Residual/Remainder Beneficiaries survive or if none are named in Section V below, then and only then shall said money remain with the trust."

Section V is titled "Contingent/Remainder/Residual Beneficiaries" and asks the life beneficiary (i.e., Givens) to list "to

whom you would like us to pay out the Remainder of your trust Sub-Account should there be any money left after the state of Missouri has been reimbursed for the Medicaid services it has rendered to you during your lifetime." The agreement states that the remainder beneficiary can be an individual person, an organization, or an entity. On the lines below this text, someone wrote "Theresa Givens" as the only remainder beneficiary. Givens signed the agreement on August 9, 2011. The Foundation signed on August 15, 2011. Givens funded the trust on October 11, 2011 with almost $255,000.

The Foundation argues that Sections IV and V together are unambiguous and provide that the Foundation will retain the remainder if there is no surviving remainder beneficiary. Because Givens named herself as the remainder beneficiary, the Foundation argues, she must have intended both (1) not to name any surviving remainder beneficiary at all, and thus (2) to give any remainder to the Foundation. The Estate counters that Sections IV and V are ambiguous and that we should construe the ambiguity in the Estate's favor. In the alternative, the Estate argues that Givens made a mistake warranting reformation, rescission, and/or deviation from the trust's terms.

D. *Givens's Children*

Because trust interpretation is a question of the settlor's intent, Givens's relationships with her adult children—who would take through her Estate—have been a focus of this litigation. The Estate argues that Givens had close relationships with her children and must have meant for the money to go to them through her Estate. The Foundation counters that the agreement itself expresses Givens's intent to leave the remainder to the trustee. According to the Foundation, Givens's gen-

eral relationship with her children is not sufficient to over-
come the agreement's text expressing Givens's intent at the
moment she signed it.

The evidence shows that during her life, Givens relied
heavily on her children for help with her medical care and
daily living. Reese testified that Givens was unable to drive,
had trouble standing, was blind in one eye, and "maneuvered
around in … a chair." In her final year, Givens lived with her
children, first with her daughter Whitney and later with her
son Stephen. Whitney provided Givens with in-home
healthcare, prepared her for her dialysis treatments, and took
her shopping and to appointments. Sons Stephen and Devon
helped her with tasks and cooked her meals.

The Foundation does not dispute these facts. In fact, its
former general counsel Shane Service testified that Givens's
"main concern was always about her children." And the rec-
ord shows that at least initially, Givens intended to spend
most of her settlement proceeds on her children. She told the
Foundation in June 2011 that she wanted to buy a home and
a car for Stephen and a car for Whitney. On July 20, 2011, Giv-
ens also told her attorneys that she wanted to buy a car for
Whitney and give $50,000 to one of her sons. On August 9,
2011, Givens wrote in the agreement that she wanted to "help
son" with "student loans." And Reese testified that shortly
before the surgery that would lead to his mother's death, she
told him "to get that money out of that trust and help" his
siblings. We assume these would not have been permissible
uses of trust assets during Givens's life, see 42 U.S.C.
§ 1396p(d)(4)(C)(iii), but they show her interest in helping her
children financially. There is no evidence, apart from the in-

ference drawn from the mistaken designation of Givens herself as the surviving contingent beneficiary in the trust agreement, that Givens would have wanted to leave her assets to the Foundation.

The Foundation responds to these facts in two ways: (1) by pointing out that they do not definitively reveal Givens's intent on August 9, 2011 when she signed the agreement; and (2) by relying on one witness who contradicted Reese's testimony about the children's happy relationships with their mother. Andrea McGaughey, a paralegal for Brown & Crouppen, testified that in late July 2011, Givens called to say she wanted to fund the trust with the full settlement proceeds because she worried that "the kids were going to take the money from her and that she was going to be left homeless."

E. *Funding the Trust*

Givens was initially unsure about funding a special needs trust at all. If she put her money in the trust, federal law would prevent her from spending it on her children during her lifetime. See 42 U.S.C. § 1396p(d)(4)(C)(iii) (requiring assets in special needs trust to be used "solely for the benefit of individuals who are disabled"). But Brown & Crouppen repeatedly told her that if she did not fund a trust, she would lose her eligibility for Medicaid. At first, Givens said that she needed time to think about the idea. She later requested that Brown & Crouppen fund the trust with $184,000 and give her the rest of the settlement in cash, which she wanted to use for herself and her children. Brown & Crouppen repeated its advice to fund the trust with all her settlement proceeds, and on July 28, 2011 Givens agreed to do so.

Just how Givens actually completed and signed the agreement is unclear. Reese testified that his mother could not read because she had poor vision and was illiterate. Yet someone filled in the 19-page form for Givens. McGaughey signed the agreement as a witness, but she swore that the paperwork was already filled in when she saw it and that she could not "say who completed the Joinder Agreement." The firm of Brown & Crouppen, although it persuaded Givens to put her settlement money in the trust, denies having advised her on the agreement's contents or reviewed the signed copy (with the obviously mistaken beneficiary designation) before forwarding it to the Foundation. However the agreement transpired, the trust was funded on October 11, 2011 with $254,847.76.

F.   *Procedural History*

Givens died intestate on November 19, 2011 with about $234,000 remaining in her trust sub-account. This litigation did not begin until 2015, after the Foundation refused the Estate's written demand that it pay the remainder to the Estate for the benefit of Givens's children. On April 6, 2015, the Foundation filed this action seeking a declaratory judgment that the Foundation rightfully retained the remaining assets of the trust. The Estate counterclaimed, arguing that the court should order the Foundation to pay the remaining money to the Estate.

Both parties moved for summary judgment. The district court first concluded that the trust agreement provides unambiguously that the remaining assets should go to the Foundation. Moving on to the Estate's equitable theories, the court found no basis for rescission or deviation but found that genuine issues of material fact barred summary judgment on the

Estate's reformation theory and the Foundation's laches defense. The court denied summary judgment on those questions, and the case went to trial.

The court held a bench trial on two questions: (1) whether the Estate could overcome the agreement's language with clear and convincing evidence that Givens intended her Estate to receive the money; and (2) whether the Estate's delay was unreasonable and prejudicial to the Foundation. The court found that the Estate's evidence was insufficient to overcome the agreement's text. The court noted that the Estate's evidence about Givens's relationship with her family did not address her intent when she signed the agreement. Accordingly, the court declined to reform the trust and instead allowed its text, as the court understood it, to control.

The court also found that laches would bar the Estate's equitable claims in any event. The court found that the family knew as early as November 23, 2011 that the Foundation intended to keep the funds. It concluded that laches applied because the Estate unreasonably delayed and that the delay prejudiced the Foundation. The court entered judgment for the Foundation.

II. *Analysis*

Reese's claim for equitable reformation has considerable force, but we find that the agreement was ambiguous and that construing it offers the more straightforward resolution. On the Foundation's motion for summary judgment, the district court found that the agreement unambiguously provided that Givens's failure to name a proper remainder beneficiary meant that the Foundation was entitled to keep the money.

We review this conclusion *de novo*, and we respectfully disagree with our colleague on the district court.[1]

Under Indiana law, which governs this trust agreement, the meaning of a trust instrument is a question of law, and the court's primary role is to discern the settlor's intent. *University of Southern Indiana Found. v. Baker*, 843 N.E.2d 528, 531–32 (Ind.

---

[1] As noted, the district court found that laches would bar the Estate's claim for equitable relief, whether on theories of mistake, reformation, or rescission. The district court's laches finding was based on clearly erroneous findings of fact. Givens died in November 2011. In finding delay and prejudice, the district court appears to have focused on the fact that in early 2012 the Foundation told Reese, as representative of his mother's Estate, that the Foundation did not intend to transfer the money to the Estate. The rest of the story, however, was that the Foundation told Reese that the money would go to the State of Missouri, which would be the most common outcome for a special needs trust upon the death of the life beneficiary. There is no evidence that the family knew before early 2015 that the Foundation intended to retain Givens's money *for itself*. Instead, all the relevant evidence indicates that the Foundation led the family to believe that Givens owed the full remainder to Missouri. The Foundation's internal records indicate that by November 2013, it had not notified the family it intended to retain the money. None of the Foundation's witnesses could recall ever telling the family how they interpreted the agreement, or even reaching a final decision to keep the remaining money. Yet the Foundation began to transfer money out of Givens's sub-account to other Foundation accounts less than two months after her death. By February 2014, the Foundation had spent it all. But it was not until early 2015 that the Foundation told the Estate that the Foundation itself had kept the money and did not intend to pay either Missouri or the Estate. The Foundation then quickly filed this declaratory judgment action. We see in this record no factual basis for finding that the Estate, having been misled by the Foundation, delayed unreasonably in asserting its rights, let alone that the Foundation reasonably relied to its detriment on the inaction of the Estate, which it had misled about the destination of the money left in Givens's trust account.

2006). To discern intent, Indiana follows the four corners rule. If the instrument is clear, then the court will consider only its language. *Id.* at 532. This rule is based on the strong but not irrebuttable presumption that an unambiguous document "accurately expresses" the settlor's intent. Restatement (Third) of Property: Wills and Other Donative Transfers, § 10.2 cmt. i. But when a trust instrument is ambiguous as applied to the circumstances, its text alone is not sufficient to decide the case. *University of Southern Indiana Found.*, 843 N.E.2d at 535 ("[W]here an instrument is ambiguous, all relevant extrinsic evidence may properly be considered in resolving this ambiguity.").

A. *Ambiguity*

Language of a contract, will, or trust is not ambiguous of course simply because two parties argue for different meanings. *In re Estate of Stayback*, 38 N.E.3d 705, 711 (Ind. App. 2015). Rather, it is ambiguous if reasonable people could come to contrary conclusions about its meaning under the circumstances. *University of Southern Indiana Found.*, 843 N.E.2d at 532. The Foundation contends that the agreement is unambiguous, but its arguments fail to address the ambiguity posed in Section IV, especially where the evidence shows that the Foundation intentionally drafted the agreement to confuse readers as sophisticated as government officials. In our analysis, we put to one side Givens's infirmities and limitations, which would only strengthen her case.

For the Foundation to succeed, the agreement must clearly provide that the Foundation will retain the money if there is no surviving remainder beneficiary. Otherwise, Givens's fail-

ure to name a remainder beneficiary does not express her intent to give the money to the Foundation. On this point, the agreement is ambiguous because it contradicts itself.

First, the agreement says flatly in Section IV, subject to an inapplicable exception, that the Foundation itself "shall not retain any portion of the Beneficiary's trust Sub-Account upon his or her death." Three sentences later, it says that if there are no surviving remainder beneficiaries, "then and only then shall said money remain with the trust." One could read the latter sentence as qualifying the former, but the former sentence ("shall not retain") includes no signal that another qualification or exception is coming. The text itself does not resolve the contradiction. Given these two contradictory sentences, reasonable people could come to two conclusions about whether, in the absence of a surviving beneficiary, the agreement awards the money to the Foundation. Readers who emphasize the former sentence will conclude that the Foundation will never retain remainder funds. Readers who emphasize the latter will conclude that failing to name a remainder beneficiary gives any leftover money to the Foundation. The Foundation points to the latter sentence to support its position, but fails to come to grips with the former sentence that contradicts its argument.

B. *Intent*

Having found ambiguity, we may look beyond the agreement's language when construing it. *University of Southern Indiana Found.*, 843 N.E.2d at 535. Our goal is still to determine the settlor's intent, but we no longer presume that the trust's language accurately expresses it. Restatement (Third) of Property: Wills and Other Donative Transfers, § 10.2 cmt. i. Instead, we consider other facts, including "the circumstances

existing at the time the instrument was executed." *Mala-chowski v. Bank One, Indianapolis*, 590 N.E.2d 559, 566 (Ind. 1992). The issue is what Givens intended when she signed the agreement naming herself as the remainder beneficiary.

We find no reason to believe that Givens intended any re-maining money to go to the Foundation, which was a stranger to her, rather than to her children. *Berry v. Ford*, 829 N.E.2d 1052, 1055 (Ind. App. 2005) (reasoning that where intent is in doubt, "a construction should be used which considers the natural impulses of people"). The only plausible conclusion is that Givens intended the money to go to her Estate and thus to her children upon her death. When Givens signed the agreement, she was an uncounseled layperson (at least on this record—the Estate is also pursuing a legal malpractice claim against the Missouri law firm that advised her to fund the trust). She certainly was not familiar with the intricacies of trusts and estates. When "it clearly and distinctly appears that the testator did not intend to employ the terms in their tech-nical sense," then the court will apply "the meaning which the testator intended they should receive." *Grise v. Weiss*, 11 N.E.2d 146, 149 (Ind. 1937), quoting *Ridgeway v. Lanphear*, 99 Ind. 251, 252 (1884); see also *University of Southern Indiana Found.*, 843 N.E.2d at 534 (considering extrinsic evidence when ambiguity in a trust instrument "creates substantial doubt" that the settlor intended words to have their "technical meaning"). When a layperson drafts a donative transfer, it should "be construed to have the meaning that a lay drafter would have intended." Restatement (Third) of Property: Wills and Other Donative Transfers, § 10.2 cmt. e. Givens wrote that her money should return to her upon her death. The most sen-sible construction of this ambiguous document is to construe

Section V as if Givens had named her Estate, not herself, as the remainder beneficiary.

Our conclusion is consistent with the principles that heirs "are not to be disinherited by conjecture" and that words will not be given their ordinary meaning if "absurdity or some repugnance" would result. *Berry v. Ford*, 829 N.E.2d 1052, 1055 (Ind. App. 2005); *Haworth v. Hubbard*, 44 N.E.2d 967, 970 (Ind. 1942). We think it highly improbable that when Givens identified herself as the remainder beneficiary, she actually intended to give the money to the Foundation. There is no other evidence that she would have wanted that result. The Foundation provided Givens with a service by managing her assets for what turned out to be just a few weeks before she died—a service for which Givens paid the Foundation. There is no plausible reason she would have intended to give it all the money that might be left upon her death.

Finally, we must note that the Foundation's counsel, Shane Service, testified that he *intentionally* drafted Section IV to *confuse* Missouri government officials. When a trust document is ambiguous, Indiana applies the rules of contract interpretation. *Stayback*, 38 N.E.3d at 710–11. Ordinarily, when "there is ambiguity in a contract, it is construed against its drafter." *MPACT Construction Group LLC v. Superior Concrete Constructors, Inc.*, 802 N.E.2d 901, 910 (Ind. 2004). That rule of construction applies here, where the trustee seeks to benefit from language that it drafted with the intent to confuse.[2]

We thus conclude that the agreement is best construed as providing that the remainder funds go to the Estate of Theresa

---

[2] The Indiana Roll of Attorneys indicates that Mr. Service's law license has been suspended indefinitely.

Givens. Having reached this conclusion as a matter of legal interpretation, we need not reach the Estate's equitable claims or the Foundation's dubious invocation of the equitable defense of laches. The judgment of the district court is REVERSED and the case is REMANDED for entry of judgment ordering the Foundation to pay the Estate $234,181.23 plus prejudgment interest.