# IN THE SUPREME COURT OF IOWA

No. 22–0736

Submitted February 22, 2023—Filed April 28, 2023

**IN THE MATTER OF THE MEDICAL ASSISTANCE POOLED SPECIAL NEEDS TRUST OF SCOTT HEWITT.**

**IOWA DEPARTMENT OF HUMAN SERVICES,**
    Appellant.

---

Appeal from the Iowa District Court for Jasper County, Thomas P. Murphy, Judge.

The Iowa Department of Human Services appeals the district court's grant of summary judgment in favor of the trustee in its challenge to the trustee's accounting of a pooled special needs trust. **AFFIRMED.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Brenna Bird, Attorney General, Laura F. Kron (argued), Assistant Attorney General, and Benjamin C. Chatman, Iowa Department of Human Services, for appellant.

Elizabeth R. Meyer (argued), Jana M. Weiler, and Elizabeth A. Etchells of Dentons Davis Brown PC, Des Moines, for the Center for Special Needs Trust Administration, appellee.

**OXLEY, Justice.**

This case involves a dispute between the Iowa Department of Human Services (DHS),[1] which administers Iowa's Medicaid program, and the trustee of a pooled special needs trust held for the benefit of Scott Hewitt. Title XIX of the Social Security Act (Title XIX) requires that the funds remaining in Mr. Hewitt's trust subaccount when he died must be used first to reimburse the state for its Medicaid expenditures, but only "[t]o the extent" the funds are not retained by the trust. 42 U.S.C. § 1396p(d)(4)(C)(iv). The trust retained the remaining balance of $25,876.85, and DHS claims it is entitled to a detailed accounting to ensure the retained funds were used for a proper purpose. Based on our review of the governing trust provisions and Iowa trust law, the trustee provided an adequate accounting and was not required to detail how the trust had, or would, use the retained funds.

I.

A pooled special needs trust is a specific type of trust established for the benefit of disabled individuals who receive Medicaid assistance. Because Medicaid is designed for individuals with little to no income, those eligible to receive it may not have adequate resources to pay for their nonmedical necessities. Pooled special needs trusts are a way for such individuals to maintain their Medicaid eligibility while also providing for their "Medicaid-ineligible expenses, such as clothing, phone service, vehicle maintenance, and

---

[1]DHS began the transition process into the Iowa Department of Health and Human Services (HHS) during the pendency of this appeal. 2022 Iowa Acts ch. 1131, § 51. We refer to the agency as DHS throughout this opinion.

taxes." *Cox v. Iowa Dep't of Hum. Servs.*, 920 N.W.2d 545, 551 (Iowa 2018) (quoting *Ctr. for Special Needs Tr. Admin., Inc. v. Olson*, 676 F.3d 688, 695 (8th Cir. 2012)).

In a pooled trust, an individual's funds are combined with other individuals' funds for investment purposes, and the trustee maintains subaccounts, or "separate trust 'accounts' . . . for each disabled individual." *Id.* (quoting *Lewis v. Alexander*, 685 F.3d 325, 333 (3d Cir. 2012) (in turn quoting Jan P. Myskowski, *Special Needs Trusts in the Era of the Uniform Trust Code*, 46 N.H. Bar J. 16, 16 (2005–2006))); *see also* Soc. Sec. Admin., *Program Operations Manual System (POMS)* SI 01120.203D(1) [hereinafter POMS], https://secure.ssa.gov/poms.nsf/lnx/0501120203 [https://perma.cc/87BZ-YZ97] ("A pooled trust contains the assets of many different individuals, each held in separate trust accounts and established through the actions of individuals for separate beneficiaries."). "By pooling these small accounts for investment and management purposes, overhead and expenses are reduced and more money is available to the beneficiary." *Cox*, 920 N.W.2d at 551 (quoting *Lewis*, 685 F.3d at 333). As the Social Security Administration explains in its *Program Operations Manual System* by way of analogy, "the pooled trust is like a bank that holds the assets of individual account holders. . . . The pooled trust instruments usually consist of an overarching 'master trust' and a joinder agreement that contains provisions specific to the individual beneficiary." POMS SI 01120.203D(1).

When a beneficiary dies, Title XIX allows the pooled trust to retain any remaining balance in the beneficiary's subaccount, but any amounts not retained must be paid to the state to reimburse it for the Medicaid benefits it provided for the individual. 42 U.S.C. § 1396p(d)(4)(C)(iv).

This case involves a pooled special needs trust established for the benefit of Scott Hewitt. In December 2018, Mr. Hewitt used funds he received from a workers' compensation settlement to fund a pooled special needs trust by executing a joinder agreement for the Iowa Pooled Trust to establish a subaccount with the National Pooled Trust. On February 28, 2019, The Center for Special Needs Trust Administration, Inc. (the Center), as trustee of the National Pooled Trust, accepted the joinder agreement, and Mr. Hewitt transferred $32,899.92 from the workers' compensation settlement to the pooled special needs trust.

Mr. Hewitt died on July 6. DHS had paid a total of $100,217.48 through the Iowa Medicaid program to cover medical expenses for Mr. Hewitt between 2005 and the time of his death. In response to DHS's claim for a medical assistance debt against Mr. Hewitt's estate, the Center informed DHS that Mr. Hewitt's estate had no assets, his pooled special needs trust subaccount had a balance of $25,876.85, and that the trust was retaining all of those funds. As further detailed during litigation, the Center verified that the funds retained from Mr. Hewitt's subaccount "were never transferred into an operating account used for the benefit of the trustee" but had "been retained in the trust's master client account." The master client account, sometimes referred to as the master

account, is an account "used to administer the pooled trust" that included Mr. Hewitt's subaccount, and all of its funds "are used for the benefit of the beneficiaries of the pooled trust." The Center also clarified that when it retains funds from individual subaccounts, it does so "pursuant to the terms of The National Pooled Trust" and that it "uses retained funds in furtherance of its nonprofit mission to provide specialized administrative services for persons with disabilities for the purpose of improving their quality of life."

On November 3, 2020, DHS filed a petition to invoke jurisdiction over the irrevocable trust in the Iowa District Court for Jasper County. *See* Iowa Code § 633C.4(2) (2020). DHS noted that the Center had never invoked the court's probate jurisdiction concerning Mr. Hewitt's pooled special needs trust by filing the required annual reports with the court as required by Iowa Code chapter 633C.[2] DHS's petition sought a "detailed accounting of how the retained funds have been or will be used, and [an] order [that] any funds after the payment of properly retained funds be paid to DHS from the assets of the trust."

In response, the Center filed an initial and final report covering activity in the Hewitt subaccount during 2019 (the only year it was in existence) and reflecting that its remaining balance had been retained by the trust, resulting in

---

[2]Because Mr. Hewitt's trust subaccount was not open for more than a year, however, the Center's fiduciary obligation to not only make these annual accountings, but to file them with the district court is not addressed further here. That issue is addressed in the companion case filed today, *The Center for Special Needs Trust Administration, Inc., v. Iowa Department of Human Services* (*In re the Medical Assistance Pooled Special Needs Trust of Steven Muller*), ___ N.W.2d ___ (Iowa 2023).

a final balance of $0.[3] It supplemented the report on October 7, 2021, with a description of how it uses retained funds for the benefit of other trust beneficiaries generally, and an explanation that it could not provide a more detailed accounting of how the retained funds from Mr. Hewitt's account were used because the funds were no longer segregated in an individual subaccount. DHS filed an objection to the supplemental report, and the parties later filed competing motions for summary judgment.

The district court granted summary judgment for the Center. After agreeing with the parties' interpretation that State and Federal Medicaid law permits the trust to retain residual funds for proper purposes after the death of a beneficiary, the court analyzed what implications that interpretation has on the Center's accounting obligations. The district court recognized that DHS would be entitled to recover funds if the Center "distributes any retained funds to family members of the beneficiary." But the court concluded that the representations from the Center that all funds in "the master account are used for the benefit of the beneficiaries of the pooled trust" satisfied its reporting obligations, and no further accounting was required absent evidence that the

---

[3]The schedules attached to the initial and final report reflect: the $32,899.92 funding from Mr. Hewitt's workers' compensation settlement, no distributions, and a total of $7,028 in disbursements over the five months the account was open. The disbursements included: $1,908 in trustee fees, $1,250 in Medicare Set-Aside administrative services fees, $3,120 in preneed services, $250 in tax analysis fees, and $500 for an administrative closing fee. After a $4.93 gain, the $25,876.85 balance was retained by the trust. The parties and district court identify $25,871.92 as the retained amount, which is reflected on the final report as the subtotal of Mr. Hewitt's subaccount prior to "capital transactions and adjustments" of the same amount. Schedule "D" to the final report reflects the "account change" that took that balance to $0, which was a net of the $4.93 gain and the $25,876.85 retention. We will use $25,876.85 as the retained amount throughout this opinion.

Center breached its trustee duties under Iowa law. We retained DHS's appeal from that decision.

II.

We review summary judgment rulings for correction of errors at law. *Kirlin v. Monaster*, 984 N.W.2d 412, 415 (Iowa 2023). "Summary judgment is proper if the only issue is the legal consequences flowing from undisputed facts." *Id.* (quoting *Johnson v. Associated Milk Producers, Inc.*, 886 N.W.2d 384, 389 (Iowa 2016)). Because the only issues here involve the interpretation of statutory and trust provisions, summary judgment was "the proper vehicle to test the validity of [the] claim[s] . . . [a]nd we need only decide whether the district court properly applied the law." *Id.* (first and third alterations and omission in original) (quoting *Hill v. State, Dep't of Hum. Servs.*, 493 N.W.2d 803, 804–05 (Iowa 1992)).

DHS argues on appeal that a pooled special needs trust can only retain funds from an individual beneficiary's subaccount for specific authorized purposes and that, as a beneficiary of the subaccount, DHS is entitled to an accounting to ensure proper disposition of any retained funds. To the extent the trustee did not retain the funds for a proper purpose, DHS claims it is entitled to the funds as reimbursement of its Medicaid expenditures. DHS's appeal explores the intersection between Medicaid trust rules and the Iowa Trust Code, so we start with an explanation of each.

To describe the Social Security Act as "complex" is an understatement.[4] As complicated as its scheme is to wade through, though, the issues in this case are limited to a narrow provision governing the interplay between trusts and Medicaid eligibility. An understanding of the trust provisions helps set the stage.

Medicaid is a cooperative federal aid program that subsidizes participating states that provide medical assistance to their residents. *See Olson*, 676 F.3d at 694. As a needs-based program, Medicaid eligibility turns on the resources and income available to an individual or family. *See Iowa Dep't of Hum. Servs. v. Lohman* (*In re Est. of Melby*), 841 N.W.2d 867, 875 (Iowa 2014). "[T]he program contemplates that families will spend available resources first, and when those resources are completely depleted [(subject to some limited exceptions)], Medicaid may provide payment." *Id.*

"State participation in the Medicaid program is voluntary, but states choosing to participate 'must comply with all federal statutory and regulatory requirements.'" *Cox,* 920 N.W.2d at 551 (quoting *Lankford v. Sherman,* 451 F.3d 496, 504 (8th Cir. 2006)). One such requirement is the treatment of trusts as detailed in subsection 1396p(d) of title 42. *See Olson*, 676 F.3d at 694–95 (citing 42 U.S.C. § 1396a(a)(18)). Recognizing that trusts can be used to shelter assets, Congress enacted a comprehensive system in subsection

---

[4]The Social Security Act, of which the Medicaid trust rules are a part, contains a "Byzantine construction," *Schweiker v. Gray Panthers*, 453 U.S. 34, 43 (1981), making it "almost unintelligible to the uninitiated," *Friedman v. Berger*, 547 F.2d 724, 727 n.7 (2d Cir. 1976) (Friendly, J.). It has been described as "an aggravated assault on the English language, resistant to attempts to understand it." *Schweiker*, 453 U.S. at 43 n.14 (quoting *Friedman v. Berger*, 409 F. Supp. 1225, 1226 (S.D.N.Y. 1976)).

1396p(d) to direct how trusts affect Medicaid eligibility. *See Lewis*, 685 F.3d at 343. As a general matter, Congress requires that assets held in trust be considered resources available to the beneficiary, which in turn reduces the beneficiary's eligibility for Medicaid. *See* 42 U.S.C. § 1396p(d)(3). This reflects Congress's primary objective "to prevent Medicaid recipients from receiving taxpayer-funded health care while they shelter[] their own assets for their benefit and the benefit of their heirs." *Lewis*, 685 F.3d at 343; *see also Johnson v. Guhl*, 357 F.3d 403, 405 (3d Cir. 2004) ("Because Medicaid is available only to the needy, creative lawyers and financial planners have devised various ways to 'shield' wealthier claimants' assets in determining Medicaid eligibility.").

But Congress excepted three types of trusts from this general eligibility rule. *See* 42 U.S.C. § 1396p(d)(4)(A)–(C); *see also* Iowa Admin. Code r. 441—75.24(3)(*a*)–(*c*) (providing the same exceptions); POMS SI 01120.203A (describing trusts established pursuant to 42 U.S.C. § 1396p(d)(4)(A) and (C) as "Medicaid trust exceptions"). The three types of excepted trusts are: an income trust funded only with the individual's income from a pension, Social Security benefits, or other stream of income, 42 U.S.C. § 1396p(d)(4)(B); an individual trust established for a disabled individual under the age of 65, *id.* § 1396p(d)(4)(A); and a pooled special needs trust established for a disabled individual of any age, *id.* § 1396p(d)(4)(C). The Iowa Medicaid regime covering medical assistance trusts hews close to the federal scheme. *See* Iowa Code § 633C.1(7) (defining "medical assistance special needs trust" to cover both the individual trusts described in 42 U.S.C. § 1396p(d)(4)(A) and the pooled trusts in 42 U.S.C. § 1396p(d)(4)(C));

Iowa Admin. Code r. 441—75.24(3)(*c*) (imposing the same requirements on Iowa pooled medical assistance special needs trusts as those found in 42 U.S.C. § 1396p(d)(4)(C)).

Special needs trusts, 42 U.S.C. § 1396p(d)(4)(A), and pooled special needs trusts, *id.* § 1396p(d)(4)(C), are " 'discretionary trust[s] established for the benefit of a person with a severe and chronic or persistent disability and [are] intended to provide for expenses that assistance programs such as Medicaid do not cover.' These expenses—books, television, Internet, travel, and even such necessities as clothing and toiletries—would rarely be considered extravagant." *Lewis*, 685 F.3d at 333 (citation omitted) (quoting *Sullivan v. County of Suffolk*, 174 F.3d 282, 284 (2d Cir. 1999)). The exceptions for these trusts in Title XIX reflect Congress's secondary objective in enacting subsection 1396p(d), which was "to shield special needs trusts from impacting Medicaid eligibility." *Id.* at 343.

A pooled special needs trust, like the one involved here, differs in significant respects from the other two. First, the trustee must be a nonprofit organization. 42 U.S.C. § 1396p(d)(4)(C)(i) (requiring the trust to be "established and managed by a non-profit association"); *see also* Iowa Admin. Code r. 441—75.24(3)(*c*)(1). Second, the trustee must maintain separate accounts for each beneficiary that are established and used solely for the benefit of that disabled individual, but the trustee can pool the accounts for investment and management purposes. 42 U.S.C. § 1396p(d)(4)(C)(ii), (iii); Iowa Admin. Code r. 441—75.24(3)(*c*)(2)–(3). Finally, and critical to the dispute here, whereas the

other two types of trusts must include a Medicaid payback provision,[5] which requires the trust to first use any funds remaining at the beneficiary's death to reimburse the state for Medicaid payments made on the beneficiary's behalf, *see* 42 U.S.C. § 1396p(d)(4)(A), (B)(ii); *see also* Iowa Admin. Code r. 441—75.24(3)(*a*)–(*b*), a pooled special needs trust is only required to reimburse the state for its Medicaid payments "[t]o the extent [those] amounts . . . are not retained by the trust," 42 U.S.C. § 1396p(d)(4)(C)(iv); *see also* Iowa Admin. Code r. 441—75.24(3)(*c*)(4). This critical distinction from the other two types of trusts reveals "Congress' evident solicitude for . . . pooled trusts." *Lewis*, 685 F.3d at 348.

DHS does not dispute that the trust at issue here is a pooled special needs trust or that the trust can "retain" the balance remaining in an individual's subaccount. It nonetheless argues that there are (or should be) limits on how the trust can use retained funds, and that the Center cannot simply choose to retain the entire remaining balance in a subaccount as a windfall when a beneficiary dies. And if some limits exist, DHS argues it should be entitled to a detailed accounting of how the retained funds are actually used.

The cases relied on by DHS to suggest there must be some limit to prevent the Center from retaining all amounts left at a beneficiary's death do not support its position. Rather, those cases reveal that the specific trust instruments, and sometimes state law, determine whether there are specific limits on how much of a beneficiary's subaccount can be retained by the trust. For instance, in

---

[5]David A. Rephan & Joelle Groshek, *ABLE Act Accounts: Achieving a Better Life Experience for Individuals with Disabilities with Tax-Preferred Savings (and the Old Reliable Special and Supplemental Needs Trusts)*, 42 Mitchell Hamline L. Rev. 963, 969 (2016).

*National Foundation for Special Needs Integrity, Inc. v. Reese*, the trust agreement provided that the trustee would not retain any portion of the beneficiary's funds upon death, and amounts remaining in the beneficiary's subaccount would be used to reimburse the state for medical assistance it had paid for the beneficiary. 881 F.3d 1023, 1026 (7th Cir. 2018). In contrast, neither Mr. Hewitt's joinder agreement nor the National Pooled Trust's governing document limited the amount of funds the trust could retain from Mr. Hewitt's subaccount upon his death. Both required only that any amounts not retained had to be used to reimburse the state.

Similarly, the trust agreement in *Pfoser v. Harpstead* "provided that up to 90 percent of any funds remaining in the sub-account at the time of Pfoser's death must be paid to the State to reimburse the Medical Assistance program for the costs paid on [his] behalf," and the trust "would retain the other 10 percent in a charitable trust for the benefit of indigent pooled trust beneficiaries who had exhausted the funds in their sub-accounts." 953 N.W.2d 507, 512 (Minn. 2021). That provision mirrored Minnesota law, which provides that pooled special needs trusts operating in Minnesota qualify for the Medicaid eligibility exception only if they limit how much a trust may retain to "ten percent of the account value at the time of the beneficiary's death" and limit the use of retained funds "for the benefit of disabled individuals who have a beneficiary interest in the pooled trust." Minn. Stat. § 256B.056, subd. 3b(d) (2020).[6] Again, in

---

[6]Although the validity of this statute was not at issue in *Pfoser, see* 953 N.W.2d at 515–16 (noting that the trust at issue met the Minnesota statutory requirements for a pooled special needs trust, but addressing the separate issue of whether a transfer into the pooled special needs

contrast, Iowa law mirrors federal law and places no limits on the amount of funds that can be retained by the trustee of a pooled special needs trust. Iowa Admin. Code r. 441—75.24(3)(*c*)(4). DHS's argument for limits on the Center's ability to retain funds from the subaccount is contrary to both Iowa law and the governing trust documents.

Even if neither the trust documents nor Iowa law limits the amount of funds that the Center can retain, DHS argues that the Center can use retained funds only for a "proper" purpose, including for the benefit of other beneficiaries of the pooled trust, *see Olson*, 676 F.3d at 695 ("Residual amounts in the pooled trust after the beneficiary's death do not have to be paid back to the state, and may be kept by the non-profit for the benefit of other pooled-trust beneficiaries."), or to cover administration fees and other overhead costs, *see Lewis*, 685 F.3d at 348–49 ("Retaining the residual enables the trust to cover administrative fees and other overhead without increasing charges on accounts of living beneficiaries[.]"). From this premise, DHS argues the Center must account for its use of any retained funds so that DHS can determine whether the retained funds are used for an improper purpose, which would entitle DHS to recover some of the remaining funds.

---

trust subjected the beneficiary to a transfer penalty, which turned on whether the transfer was given for "valuable consideration"), the United States Court of Appeals for the Third Circuit held in *Lewis v. Alexander* that a Pennsylvania law imposing similar restrictions on a pooled special needs trust's ability to retain funds was preempted by Title XIX, *see Lewis*, 685 F.3d at 346–49 (holding the Pennsylvania statute that limited a trustee to retaining only 50% of remaining trust balance was preempted by 42 U.S.C. § 1396p(d)(4)(C) because that statute "leaves it to the trust to decide how much—if any—money should be provided to the State to reimburse it for Medicaid expenses"). We need not tarry on this issue, however, because Iowa law mirrors federal law on this point. *Compare* 42 U.S.C. § 1396p(d)(4)(C)(iv)*, with* Iowa Admin. Code r. 441—75.24(3)(*c*)(4).

DHS's position—that it is entitled to an accounting of how the retained funds are actually used, not just that they were retained for a proper purpose—cannot be squared with the governing Medicaid statutes or Iowa trust law for two reasons.

First, the Center cannot retain the funds until the beneficiary dies, which simultaneously triggers the termination of the trust and ends the need for any further accounting. *See* 42 U.S.C. § 1396p(d)(4)(C)(iv). When the beneficiary dies, his or her individual trust subaccount terminates and the trustee winds up that individual subaccount by distributing the trust res and providing a final accounting. *See* Iowa Code § 633A.2201(1)(*b*) ("[A] trust terminates when . . . [t]he trust purpose is fulfilled.").[7] "On termination of a trust, the trustee may exercise the powers necessary to wind up the affairs of the trust and distribute the trust property to those entitled to the trust property." *Id.* § 633A.2201(2). For a pooled special needs trust, distribution of the trust subaccount includes choosing whether to retain the remaining subaccount balance, in whole or in part, and remitting any balance first to DHS to reimburse its Medicaid expenditures and, if any funds remain, then to any residual beneficiaries. *See* 42 U.S.C. § 1396p(d)(4)(C)(iv); *see also Reese*, 881 F.3d at 1026 ("The trust agreement can direct who should receive any assets that might remain after reimbursement.").

---

[7]That the trust subaccount terminates at the beneficiary's death and must be wound up is consistent with the trust documents governing Mr. Hewitt's subaccount. Section 5.08 of the joinder agreement directs: "At the death of the Beneficiary, the Trustee shall wind up the affairs of the Trust . . . ."

But once the trust terminates and the trustee distributes the trust assets, there is no longer a trust to account for. As we recognized in *Cox v. Iowa Department of Human Services*, each subaccount managed by a pooled special needs trust is considered a separate trust for that individual beneficiary. 920 N.W.2d at 551 (describing the required subaccounts as "separate trust 'accounts' being maintained for each disabled individual." (quoting *Lewis*, 685 F.3d at 333)); *see also* POMS SI 01120.203D(1) (When "evaluating the trust, it is important to distinguish between the master trust, which is established through the actions of the nonprofit association, and the *individual trust accounts* within the master trust, which are established through the actions of the individual or another person or entity for the individual, through a joinder agreement." (emphasis added)). Thus, DHS's interest extended only to Mr. Hewitt's individual trust subaccount, and does not entitle it to an accounting of the Center's "master trust" account.

Second, section 1396p(d)(4)(C) gives DHS an interest as a contingent beneficiary—contingent on whether the trust retains the remaining funds. *See* 42 U.S.C. § 1396p(d)(4)(C)(iv) ("*To the extent* that amounts remaining in the beneficiary's account upon the death of the beneficiary *are not retained by the trust*, the trust pays to the State from such remaining amounts in the account an amount equal to the total amount of medical assistance paid on behalf of the beneficiary under the State plan under this subchapter." (emphasis added)). The contingency is defeated and DHS's interest ends under the terms of the statute when the trust retains the remaining funds, not when it ultimately uses them.

This is consistent with Congress's chosen treatment of pooled special needs trusts in Title XIX, "intended to shield the trust from repayment obligations" based on the trust's retention decision. *Lewis*, 685 F.3d at 348–49 (identifying section 1396p(d)(4)(C) as a "protective provision" that "leaves it to the trust to decide" whether and how much reimbursement the state is entitled to). Because a trustee's accounting duty only requires it to keep beneficiaries "reasonably informed about the administration of the trust and the material facts necessary to protect the beneficiaries' interests," Iowa Code § 633A.4213, and because, after the trust retains the funds as part of the wind up process, there is no longer a contingent interest in favor of DHS (or even a trust subaccount to administer), DHS is only entitled to an accounting showing that the trust retained the funds for a proper purpose.

The accounting provided by the Center here informed DHS of the activity in Mr. Hewitt's subaccount during the relevant period, that the Center retained the full remaining balance left at the time of his death, and that the retained amount would be used "pursuant to the terms of The National Pooled Trust" and "in furtherance of its nonprofit mission to provide specialized administrative services for persons with disabilities for the purpose of improving their quality of life." The trust documents also identified what the retained funds could not be used for. Section 6.3 of the National Pooled Trust's governing document, titled "Specifically Prohibited Expenses," expressly prohibits the Center from using retained funds for improper purposes, including to: "1) pay taxes due from the estate of a Beneficiary other than those arising from inclusion of the Trust in the

estate; 2) pay inheritance taxes due for residual beneficiaries; 3) make payment of debts owed to third parties; 4) pay for funeral expenses; and/or, 5) make any payments to residual beneficiaries."[8]

The Center's affirmation that it retained the funds in the master account for the benefit of the trust beneficiaries and would not use the funds for the specified prohibited purposes satisfied its accounting obligations. To impose continuing accounting obligations until the funds are in fact used would ignore both that DHS's contingent interest dissipated when the Center retained the balance and that the trust terminated, leaving nothing to further report. To the extent DHS is nevertheless concerned that the trust's ultimate disposition of retained funds is improper, there are other avenues by which it can seek to remedy any suspected misuse. *See The Ctr. for Special Needs Tr. Admin., Inc. v. Iowa Dep't of Hum. Servs.*, (*In re the Med. Assistance Pooled Special Needs Tr. of Steven Muller*), ___ N.W.2d ___, ___ (Iowa 2023). A petition for an accounting is not one of them.

III.

The district court's summary judgment is affirmed.

**AFFIRMED.**

---

[8]These limitations are also reflected in the Social Security Administration's *Program Operations Manual System*, *see* POMS SI 01120.203E(2), which is followed by a note: "For the purpose of prohibiting payments prior to reimbursement of the State(s) for medical assistance, a pooled trust is not considered a residual or remainder beneficiary. *Remember that a pooled trust has the right to retain funds upon the death of the beneficiary*." *Id.* (emphasis added). This note reflects that a pooled trust that retains funds on the death of a beneficiary is not paying itself as a residual beneficiary but, by statute, is authorized to retain the funds rather than use them to reimburse the state.